**PENNSYLVANIA ELECTRIC COMPANY**

v.

**The UNITED STATES.**

**GENERAL PUBLIC UTILITIES CORPORATION et al.**

v.

**The UNITED STATES.**

Nos. 47012, 48938, 50202, 50203, 50201.

United States Court of Claims.

Nov. 8, 1955.

Jerome R. Hellerstein, New York City, for plaintiffs. Victor Brudney, New

York City, and Alan Rosenblat, Chicago, Ill., were on the briefs.

H. S. Fessenden, Washington, D. C., with whom was Asst. Atty. Gen., H. Brian Holland for defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff Pennsylvania Electric Company, hereinafter called Penelec, was an operating electric utility company in Pennsylvania. It was a member of a highly complex hierarchy of which the Associated Gas and Electric Company, Ageco, was the top holding company, and there were a number of intermediate holding companies between Ageco at the top, and Penelec and the numerous other operating companies.

About July 1931, Penelec issued and sold to the public through bankers some $9,000,000 principal amount of its 3½% Gold Notes due August 1, 1932. As the due date of these Gold Notes approached, Penelec did not have the money, nor the capacity to borrow at banks, to pay them. Other operating companies in the Ageco system also had large debts falling due in 1932.

The parent, grandparent, and great grandparent of Penelec, in the holding company system, had their bonds outstanding in the hands of some 190,000 investors. The parent companies solicited these holders of their securities to buy additional bonds, but were able to sell only $7,600,000 worth of bonds to them out of an offer of $40,000,000.

The parent companies held large quantities of bonds of their operating companies, which they had taken for the purpose of marketing if a situation arose in which it was necessary to raise cash and the holding companies' own bonds would not sell to advantage. Among bonds so held by parent companies were $13,551,000 principal amount of Penelec's Series E and G bonds. But these bonds were not as readily salable as was necessary, and it was decided that Penelec should exchange to its parent companies for these bonds, bonds more attractive to investors because they had a shorter maturity and a higher interest rate. For this exchange Penelec issued its Series H bonds. But it issued only $12,000,000 of Series H bonds in exchange for the $13,551,000 of Series E and G bonds which were surrendered. This made Penelec's balance sheet look $1,551,000 better, and made its Series H bonds look still more attractive to potential purchasers of the H bonds from the parent companies.

Penelec's parent companies then offered the Series H bonds to the holders of the $9,000,000 of Gold Notes, whose maturity was impending, at bargain prices. They offered $6,000 of Series H bonds, plus $200 in cash, for each $5,000 of Gold Notes. Only $852,000 face value of the Series H bonds were disposed of on this basis. They next offered new Penelec One, Two, and Three Year Gold Notes, which contained the privilege of conversion of each $1,000 of such notes into $1,200 of Series H bonds. This offer did not bring in all of the 1932 Gold Notes, and the rest of them were bought in for cash which was raised by selling the new convertible Gold Notes to bankers.

As we have said, only $12,000,000 of Penelec Series H bonds were given by it to its parent companies in exchange for $13,551,000 face value of its Series E and G bonds. The Commissioner of Internal Revenue held that Penelec had made a profit out of this transaction. The profit was not the entire $1,551,000 difference between the two figures, because Penelec, when it had originally issued the E and G bonds, had not received their face value, but only 95% of their face value. After allowing for this discount, the profit which the Commissioner of Internal Revenue attributed to the exchange of H bonds for E and G bonds was $873,450. This alleged profit was called a "premium" and, for in-

come tax purposes was to be "amortized" or distributed in equal parts over the 30-year life of the bonds. Thus Penelec was held to have a profit of $29,115 for each year of the life of the bonds.

For the years 1932 and 1933 consolidated federal income tax returns were filed by Ageco, the top holding company of the affiliated group, for all the members of the group including Penelec and the parent companies involved in the exchange of the bonds. In such a consolidated return no gain or loss on intergroup transactions was permitted to be taken into account. Therefore, for the years 1932 and 1933 the alleged profit of $29,115 was not taxed. But the law permitting consolidated returns for such groups was changed, and for the years 1934 to 1938 inclusive and for the years 1940 and 1941, Penelec filed its separate return and was required to pay the tax on the $29,115 of profit for each of those years. For the year 1942, the top holding company of the system filed a consolidated return for the whole group. The H bonds then held by persons other than the group covered by the consolidated return were retired in that year, and the unamortized "premium" was taxed.

■ The Commissioner of Internal Revenue, in concluding that Penelec had made a profit on the exchange of the bonds, merely subtracted the face value figure of the H bonds put out from the face value figures of the E and G bonds taken in, with an appropriate adjustment for the fact that the latter bonds had originally been issued at a 5% discount. The plaintiff Penelec says that the difference between the figures was not profit, but was a capital contribution to Penelec by its parent companies for the purpose of improving its financial situation and making its newly issued securities more marketable. Our findings show that, in our view, it was such a capital contribution and not a taxable profit.

■ Penelec's parent companies, which owned its stock, could, of course, have dictated any terms which they chose for the exchange of the bonds. They chose to make the capital contribution because Penelec was their property, and its financial integrity and credit were valuable to that proprietary interest. The situation was unlike that in Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477, and Marshall Drug Co. v. United States, 95 F.Supp. 820, 118 Ct.Cl. 532, where creditors having no proprietary interest in the debtor made the best settlement they could get of insecure debts. In those cases the debtor, as taxpayer, was claiming that the reduction was a non-taxable gift. It was not, because there was no donative intent. But a contribution to capital does not require a donative intent, in the sense that there should be no business motive in making it. There is always the proprietor's business motive of making his property more valuable.

■ In Penelec's accounting, it treated the difference in the face value of the bonds involved in the exchange as a capital contribution. Then the Pennsylvania Public Utility Commission required it to change its accounting so as to amortize the amount, as a premium, over the life of the bonds. The system of accounting imposed upon a public utility by a regulatory commission is "not binding upon the Commissioner [of Internal Revenue]; nor may he resort to the rules of that body, made for other purposes, for the determination of tax liability under the revenue acts." Old Colony Railroad Company v. Commissioner, 284 U.S. 552, 562, 52 S.Ct. 211, 214, 76 L.Ed. 484.

If the difference in the face value of the bonds which the Commissioner of Internal Revenue designated as a premium was not, as we have found, a capital contribution, it would seem to us to have been a situation for the application of the doctrine of United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, and Commissioner of Int. Revenue v. Jacobson, 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477. In those cases the taxpayer purchased some of

its bonds at less than the issuing price, and the Court held that the difference was taxable income in the year in which the bonds were purchased. Treasury Regulations 77 (1932 ed.) Art. 68, Sec. 3(c) says:

"If, however, the corporation purchases and retires any of such bonds at a price less than the issuing price plus any amount of discount already deducted, the excess   *   *   * over the purchase price is gain or income for the taxable year."

From the foregoing it would seem that, if the excess in question here was taxable at all, it was taxable in 1932 and was not a proper subject for amortization.

The plaintiffs make an argument concerning the year 1942 which they are foreclosed from making for the other years in question because they did not, in their claims for refund for the other years, assert that basis for their claims. They say that, far from their having exchanged their H bonds at a premium, as the Government says they did, they exchanged them at a discount, and were entitled to the deduction provided for in Sec. 3(a) of the Treasury Regulation referred to above, which says:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

The plaintiffs' argument on this point is not easy to follow. The usual case of the issuance of bonds at a discount is the sale of the bonds by the issuer at less than par. Here $12,000,000 of H bonds were exchanged for $13,551,000 of E and G bonds. But the plaintiffs say, and we have found, that if the H bonds had been offered to the public in arms-length sales they would not have brought more than $78 per $100 of face value. Therefore, say the plaintiffs, the sale by Penelec to its parent companies should be treated as if it had been made at $78, the market value. They say that the Commissioner of Internal Revenue could,

if the tables had been turned, have disregarded the figures used by the affiliates and put true values upon the objects of the exchange. For a simple illustration, if Penelec's H bonds had been worth $100 in the market, but it had issued them to its parent company, which owned all of its stock, for $90, the Commissioner could have concluded that that was a way of giving the parent a dividend, on which, when it resold the bonds in the market, it would be taxed only at the capital gains rate, and giving Penelec a deduction for the discount at which it issued the bonds. The plaintiffs are right, of course, in their view of what the Commissioner of Internal Revenue could, and probably would, do in that situation. But we think that the maxim, "What's sauce for the goose, etc." is not of such universal validity as to compel the conclusion that the affiliated group can also disregard the figures which it has used in its intra-family transactions.

Omitting the $1,551,000 of E and G bonds which we have found to have been a capital contribution to Penelec by its parents, the exchange was $12,000,000 of H bonds for $12,000,000 of E and G bonds. The plaintiff asserts and we have found that the H bonds were worth only $78 in the open market. We have found that the market for the E and G bonds was similarly depressed. But Penelec owed the face value of the E and G bonds, before the exchange, and owed the face value of the H bonds, after the exchange. Unless it could find the cash to buy them up in open market while that market was still depressed, the face value was the amount which it would have to pay when the bonds came due. We think the H bonds were not issued at a discount.

The plaintiffs' argument is original and there are no decisions in point. A somewhat similar claim was made in Spear Box Company, Inc., v. Commissioner, 2 Cir., 182 F.2d 844, 847. There the taxpayer had bought up some of its debentures at less than par, and the Commissioner proposed to tax it on the

difference. The taxpayer claimed that the debentures were not worth par and that only the excess of their actual value over the redemption cost should be taxed. The court said that the regulations provided that the issuing price was determinative and further said:

"This is as it should be, for the debtor *owes* the face amount of his debt."

The plaintiffs are entitled to recover, with interest according to law. Entry of judgment is suspended to await the filing of a stipulation by the parties showing the amount due in accordance with our opinion and findings of fact.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.