Fender Sales, Inc., et al. [1] v. Commissioner. Fender Sales, Inc. v. Commissioner
Docket Nos. 92757-92762, 94762.
United States Tax Court
T.C. Memo 1963-119; 1963 Tax Ct. Memo LEXIS 225; 22 T.C.M. (CCH) 550; T.C.M. (RIA) 63119; April 26, 1963
*225 Held, petitioner C. Leo Fender was not taxable on bonus payments received in 1956 and 1957 to the extent such bonuses were returned in the year of receipt to his employer. Held further, petitioner Fender Instrument Co. did not understate its salary expense deduction in the year 1956, and it did not overstate its miscellaneous income in the year 1957. Held further, petitioner C. Leo Fender received taxable income in the amount of $40,000 as a result of the withdrawal of said sum in 1958 from Fender Instrument Co. Held further, petitioners Donald D. Randall and C. Leo Fender did not realize taxable income in 1956 and 1958 upon the receipt of additional common stock from Fender Sales, Inc., in satisfaction of accrued salaries when both before and after the receipt of said stock the individuals each owned 50 percent of the corporation's outstanding stock. Held further, petitioner Fender Sales, Inc., did not realize taxable income in its fiscal years ended May 31, 1957, and May 31, 1958, since the cancellations of its accrued salary indebtedness to its two shareholders by said shareholders constituted capital contributions. Held further, petitioner Fender Sales, Inc., failed *226 to prove that the respondent erred in disallowing a portion of the "rental" payments made to Donald D. Randall during the fiscal years ended May 31, 1956, and May 31, 1957. Paul F. Loveridge, Esq., and William C. Jordan, Esq., Box 1495, Santa Ana, Calif., for the petitioners. Edward M. Fox, Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' income taxes for the years and *227 in the amounts as follows: Dkt.
Year
No.
Petitioner
Ended
Deficiency
92757
Fender Sales, Inc.
5/31/56
$ 7,104.85 *
5/3//57
57,020.86 *
5/31/58
19,266.36
92758
Donald D. Randall
and Jean E. Ran-
dall
12/31/57
8,910.01
12/31/58
12,025.66
92759
Esther Fender
12/31/56
22,189.99
12/31/57
8,388.86
12/31/58
19,341.50
92760
Jean E. Randall
12/31/56
15,917.60
92761
Donald D. Randall
12/31/56
16,073.60
92762
C. Leo Fender
12/31/56
22,189.99
12/31/57
8,388.86
12/31/58
19,341.49
947-62
Fender Electric In-
strument Co., Inc.
12/31/56
161.99
12/31/57
241.86
12/31/58
1,113.66
There are six issues presented for decision in this proceeding: [2]
1. Whether the full amounts of $30,357.84 and $37,205.04 received by C. Leo Fender as salary bonuses from Fender Electric Instrument Co. in the years 1956 and 1957, respectively, constitute *228 taxable income, notwithstanding C. Leo Fender's subsequent return of $22,000 in 1956 and $25,000 in 1957 to Fender Electric Instrument Co. 2. Whether a withdrawal of $40,000 by C. Leo Fender from Fender Electric Instrument Co. in the year 1958 constitutes a taxable dividend or a bona fide loan. These issues are present in Docket Nos. 92759 and 92762 only. 3. Whether Fender Electric Instrument Co., in accounting for C. Leo Fender's purported return of salary bonuses, understated its salary expense deduction in 1956 and overstated its miscellaneous income in 1957 by the amounts of $22,000 and $25,000, respectively. This issue is present in Docket No. 947-62 only, and its resolution is dependent upon the disposition of Issue No. 1. 4. Whether Donald D. Randall and C. Leo Fender realized taxable income in 1956 and 1958 upon the receipt of stock from Fender Sales, Inc., in payment of accrued salaries. This issue is present in Docket Nos. 92758, 92759, 92760, 92761 and 92762. 5. Whether Fender Sales, Inc., realized taxable income in its fiscal years ended May 31, 1957, and May 31, 1958, as the result of the cancellations of its salary indebtedness to C. Leo Fender and Donald *229 D. Randall. This issue is an alternative to Issue No. 4 and is present in Docket No. 92757 only. 6. Whether a portion of the airplane rental payments made by Fender Sales, Inc., to Donald D. Randall during the fiscal years ended May 31, 1956, and May 31, 1957, represented nondeductible dividends as distinguished from deductible business expenses. This issue is present in Docket No. 92757 only. Findings of Fact Some of the facts have been stipulated, are incorporated herein by this reference, and are found accordingly. Petitioner C. Leo Fender, hereinafter referred to as Fender, and Esther Fender, are husband and wife with residence in Fullerton, California. Said petitioners make their Federal income tax returns on a calendar year basis and use the cash method of accounting. For the years 1956, 1957 and 1958, Fender and Esther Fender each filed individual Federal income tax returns *230 with the district director of internal revenue at Los Angeles, California. Petitioners Donald D. Randall, hereinafter referred to as Randall, and Jean E. Randall, are husband and wife with residence at Santa Ana, California. Said petitioners make their Federal income tax returns on a calendar year basis and use the cash method of accounting. For the year 1956, Randall and Jean E. Randall each filed an individual Federal income tax return with the district director of internal revenue at Los Angeles, California. For the years 1957 and 1958 Randall and his wife filed joint Federal income tax returns with the district director of internal revenue at Los Angeles, California. Petitioner Fender Electric Instrument Co., Inc., hereinafter referred to as Instrument, is a California corporation with its principal place of business in Fullerton, California. Instrument makes its returns for Federal income tax purposes on the calendar year basis, using the accrual method of accounting. For the years 1956, 1957 and 1958, Instrument filed its corporate Federal income tax returns with the district director of internal revenue at Los Angeles, California. Petitioner Fender Sales, Inc., hereinafter *231 referred to as Sales, is a California corporation with its principal place of business located in Santa Ana, California. Sales makes its returns for Federal income tax purposes on the basis of a fiscal year commencing on June 1 and terminating on May 31, and it uses the accrual method of accounting. For the fiscal years ended May 31, 1956, 1957 and 1958, Sales filed corporate Federal income tax returns with the district director of internal revenue at Los Angeles, California. Instrument was organized on December 6, 1951, to engage principally in the business of manufacturing musical instruments. Its principal product is an electric guitar invented and developed by Fender. Prior to its incorporation, the business conducted by Instrument had been carried on by Fender as a sole proprietorship. Upon the incorporation of Instrument, Fender transferred to the corporation certain of the sole proprietorship's assets, subject to the sole proprietorship's liabilities, in exchange for the corporation's stock. At all times since the incorporation of Instrument, Fender has been the sole owner of all of its issued and outstanding capital stock. At all times since the incorporation of Instrument, *232 Fender has been the corporation's president, treasurer and chairman of its board of directors; Esther Fender has been the corporation's vice president and until January 1, 1959, was the corporation's secretary. At all times since the incorporation of Instrument, the corporation's board of directors consisted of Fender, Esther and Lloyd Verry. Until May 1, 1955, Fender's basic salary for services rendered to Instrument was $500 per month. After May 1955, Fender's basic salary was increased to $1,000 per month. In addition to said basic salary, at all times since the incorporation of Instrument, the board of directors of the corporation authorized the payment to Fender of a yearly salary bonus equal to 5 percent of Instrument's annual sales, which bonus was payable to Fender after the end of the calendar year. For the year 1955, Fender's bonus amounted to $30,357.84. Said amount was accrued on the books of Instrument as officers' salaries payable and said amount was deducted by Instrument as a business expense on its Federal income tax return for 1955, which return was filed on June 15, 1956.
Under date of January 12, 1956, the minute book of Instrument contains the following entry: *233 "Mr. Fender offered to return to the corporation $22,000.00 of his bonus. Offer to be accepted." On January 31, 1956, Instrument executed and delivered its check to Fender in the amount of $24,809.43. The amount of $24,809.43 represented Fender's 1955 salary bonus of $30,357.84 less withholdings of $5,548.41. In recording this transaction on its books, Instrument's bookkeeper debited officers' salaries payable with $30,357.84 and credited the cash account with $24,809.43 and the taxes payable account with $5,548.41. On March 2, 1956, the check payable to Fender in the amount of $24,809.43 was endorsed by Fender, returned to Instrument and deposited by the corporation in its general bank account. No bookkeeping entries were made to record the return of said check until July 31, 1956. In recording the receipt of the check from Fender, Instrument's bookkeeper debited the cash account with $24,809.43 and credited a receivable account (number 6) [3] with $24,058.37. [4]
*234 Even though Fender was the treasurer of Instrument and was vested with final authority over the corporation's books and records, he nevertheless generally disassociated himself from the mechanics of recordkeeping and left such matters up to the bookkeeping department. Under date of May 7, 1956, the minute book of Instrument contained the following entry: "The President's compensation to be continued at $12,000.00 annually plus a bonus of 5 per cent of sales payable after the end of the calendar year." For the year 1956, Fender's bonus amounted to $37,205.04. Said amount was accrued on the books of Instrument as officers' salaries payable and said amount was deducted by the corporation as a business expense on its Federal corporate income tax return for 1956. Under date of January 16, 1957, the minute book of Instrument contained the following entry: "Mr. Clarence L. Fender [C. Leo Fender] offers to return to the corporation $25,000.00 of his bonus. Offer to be accepted." On January 15, 1957, Fender issued his personal check payable to Instrument in the amount of $25,000. Upon receipt of this check, Instrument's bookkeeper debited the cash account with $25,000 and credited *235 the notes payable account with $25,000. On January 16, 1957, Instrument executed and delivered its check, apparently erroneously dated January 18, 1957, to Fender in the amount of $30,383.63. The amount of $30,383.63 represented Fender's 1956 salary bonus in the amount of $37,205.04 less withholdings of $6,821.41. This check was endorsed by Fender and deposited in his personal bank account on January 16, 1957. On March 2, 1956, when Fender returned to Instrument its check for $24,809.43, and on January 15, 1957, when Fender issued his personal check in the amount of $25,000 to Instrument, he gave the bookkeeper no instructions with regard to the manner in which such transactions were to be treated on Instrument's books. The initial entries on Instrument's books reflecting these transactions were the creation of Instrument's bookkeeper. Instrument employed a public accountant to audit its books, assist its bookkeeper and prepare its income tax returns. In the course of preparing the December 31 closing entries for Instrument's books for the years 1956 and 1957, the public accountant determined that the return of the $24,809.43 check on March 2, 1956, and the receipt of the $25,000 *236 check on January 16, 1957, should be recorded as reductions in Fender's salary rather than as loans to the corporation or as repayments of amounts owed by Fender to the corporation. The public accountant's decision was based upon his belief that the entries on Instrument's books did not correspond with the action taken in the minutes of January 12, 1956, and January 16, 1957, respectively. The public accountant advised Fender that in his opinion the bookkeeper had erroneously recorded the transactions and suggested a correction. Fender authorized the public accountant to make any correcting entries he deemed proper. To correct the initial entries in connection with the return of the 1955 salary bonus, the receivable account (number 6) was debited with $22,000 and the officers' salaries expense account was credited with $22,000. [5] To correct the initial entries in connection with the return of the 1956 salary bonus, the amount of $25,000 was eliminated from the notes payable account and treated as an item of miscellaneous income. Fender, prior to being advised by the public accountant, did not know how the bonus return transaction had been handled by Instrument's bookkeeper. *237 Under date of May 6, 1957, the minute books of Instrument contained the following entry: "The president's compensation to be $12,000.00 annually plus a bonus of 5 per cent of sales payable after the end of the calendar year." Instrument, although successful, has since its inception operated with a precarious cash position. Because of this chronic financial condition, as well as a particular deficiency of funds during 1956 and 1957, Fender decided that the best way to handle the matter would be for him to return the bonuses. The return of the bonuses, while motivated by Instrument's cash predicament, was a voluntary undertaking on the part of Fender. On their individual income tax returns for 1956, Fender and his wife reported as the total salary income received by Fender from Instrument for said year the amount of $20,357.84, which amount consisted of the basic salary of $12,000 per year plus a bonus of $8,357.84. On their individual income tax returns for 1957, Fender and his wife reported as the total salary income received by Fender from Instrument for said year the amount of $23,205.04, which amount consisted of basic salary of $11,000 [6] plus a bonus of $12,205.04. *238 On its corporate income tax return for 1956, Instrument claimed a deduction for officers' salaries which was $22,000 less than the actual amount of such officers' salaries paid or accrued for services rendered by officers during 1956. On its corporate income tax return for 1957, Instrument treated its receipt of $25,000 from Fender during said year as additional miscellaneous income earned during said year. At the time Instrument was organized in 1951, Fender transferred substantially all of the assets of his sole proprietorship, with the exception of a building and land located at 122 Pomona Avenue, Fullerton, California, to the corporation. The building and land retained by Fender were leased by Fender to Instrument for a rent of $300 per month. Shortly after the commencement of operations by Instrument it became apparent that the Pomona Street property was not adequate for the needs of the business. Accordingly, it was determined that additional land and buildings would be acquired by Fender. The minutes of the annual stockholder meeting of Instrument held on May 5, 1952, contain the following entry: Esther Fender moved the Board of Directors be directed to loan to C. *239 L. Fender up to $11,000.00 for the purchase of land and up to $100,000.00 for the construction of buildings, such buildings to be leased exclusively to Fender Electric Instrument Company, Inc. On the same day, the board of directors of Instrument passed a resolution authorizing the president of Instrument to carry out the stockholder's directive. Subsequent to May 5, 1952, real property located on South Raymond Street in Fullerton, California, was purchased in the nameof Fender. Shortly thereafter construction of office and plant buildings, totalling three in number, was commenced on said property. Although title to the land and buildings was in Fender's name, the costs of acquisition and construction were paid by Instrument. Since October 31, 1952, there has appeared on the books of account of Instrument a receivable account (number 6A) entitled "Advances on Buildings." Said account is used exclusively to record amounts paid by Instrument on construction of new buildings and has always had a debit balance at the end of each year. On the books of Instrument there also appears a receivable account (number 6) which was created in December 1951 and used as a clearing account to *240 record transactions between Fender and Instrument. Debits to this account were posted when the corporation paid noncorporate expenses of Fender, such as his doctor bills, income taxes, etc.; credits were posted when Fender returned salary, bonus or rental payments to the corporation and when he paid over to the corporation the proceeds of the sale of the Pomona Street property. In each case where a credit entry reflects a return of bonus by Fender, the bonus was reported by Fender as taxable income. Fender returned portions of his salary, bonus and rental payments to Instrument because the latter has since its inception been in a precarious cash position and has been unable to make such payments to Fender without jeopardizing its cash position. The returned bonus, salary and rental payments account for a large portion of the credit balance appearing in account (number 6). The initial costs of acquisition and construction totalling $30,917.38 of the Raymond Street property were originally debited to account (number 6); later the amount of $30,917.38 was removed from this account and posted to account (number 6A). The year-end balance of accounts (numbered 6 and 6A) and the net difference *241 in the balances of said accounts for the years 1952 through 1959 were as follows: Account 6A [7]
Account 6
Net Differ-
Debit
Credit
ence Debit
Year
Balance
Balance
Balance
1952
$ 54,031.94
[13,754.47)
$67,786.41
1953
97,657.14
36,157.06
31,500.08
1954
100,915.51
47,044.82
53,870.69
1955
101,910.91
47,416.82
54,494.09
1956
101,910.91
37,671.65
64,239.26
1957
101,910.91
40,793.43
61,117.48
1958
141,910.91
54,881.75
87,029.16
1959
141,910.91
46,512.71
95,398.20
Since the end of 1959 Instrument has ceased paying any of the personal expenses of Fender. The balances in accounts (numbered 6 and 6A) at the end of 1959 are the balances existing in said accounts at the present time. In December 1952, at about the time the first three buildings were nearing completion, Fender and Instrument entered into a lease providing for the rental of the Raymond Street property to Instrument for $720 per month. *242 Between 1953 and 1955 Fender constructed another building on the Raymond Street property and leased it to Instrument for an additional rent of $240 per month. On November 1, 1955, Terrafen, Inc., was organized and incorporated under the laws of the State of California. The primary purpose for which Terrafen was incorporated was to own and operate as lessor the real property and buildings located at 500 South Raymond Street in Fullerton, California. In exchange for all of the issued and outstanding stock of Terrafen and for a promissory note dated November 1, 1955, in the principal amount of $54,165.85, Fender transferred to Terrafen said real property and buildings. The opening book entries of Terrafen, in summary form, were as follows: Assets
Land
$10,940.00
Buildings
90,970.91
Total Assets
$101,910.91
Liabilities and Capital
Depreciation on buildings
$ 6,651.97
Note payable - Fender
54,165.85
Capital stock
41,093.09
Total Liabilities and Capital
$101,910.91 The amount of the promissory note, $54,165.85, represented the difference between accounts (numbered 6 and 6A) on the books of Instrument as of the date of incorporation of Terrafen. *243 Terrafen did not assume any liabilities to Instrument in connection with the transfer to it by Fender of the land and buildings. At all times since its incorporation, Terrafen has leased the land and buildings located at 500 South Raymond Street, Fullerton, California, to Instrument. At all times since its incorporation, Fender has been the sole stockholder of Terrafen. Prior to September 30, 1956, Terrafen obtained a loan from the United States National Bank of San Diego in the amount of $50,000, which loan was secured by a deed of trust on the land and buildings located at 500 South Raymond Street, Fullerton, California. The $50,000 proceeds of said loan were then paid by Terrafen to Fender in partial discharge of the promissory note for said amount given to Fender on November 1, 1955. As of February 1, 1956, Instrument commenced paying rentals of $2,125 per month to Terrafen. The minutes of a meeting of the board of directors of Instrument held on May 5, 1958, contain the following entry: Due to the limitation of manufacturing facilities the owner from whom we lease our present land and buildings has offered to erect additional buildings. Esther Fender moved that the President *244 be authorized to advance up to $50,000.00 to the owners of the property for this purpose. On October 14, 1958, Instrument issued its check, number 10228, payable to Fender in the amount of $40,000 and the "Advances on Buildings" account was debited $40,000. Immediately prior to this book entry, the "Advances on Buildings" account had a debit balance of $104,385.33. After this book entry was made, the "Advances on Buildings" account had a debit balance of $144,385.33. Fender executed a promissory note with Instrument as payee, dated October 14, 1958, and in the face amount of $40,000. The note was for 5 years and provided for interest at the rate of 6 percent per annum from October 14, 1958. The interest, however, was not payable until maturity of the note. Although Fender admitted executing the note, he was extremely vague concerning the time of and circumstances under which it was executed. Furthermore, Fender was not sure where the note was kept after its execution; and Fender's accountant, who was also the accountant for Instrument, did not know prior to 1960 that such a note even existed. The accountant first became aware of the note's existence during a discussion with Fender *245 in connection with certain adjustments to Fender's and Instrument's income tax returns for 1958 which had been proposed by a revenue agent following an audit of said returns. Although Instrument filed its income tax returns and kept its books on an accrual basis, it did not at the end of each year accrue any interest on the note received from Fender. After receipt of the check for $40,000, Fender loaned said amount to Terrafen to be used to finance the construction of additional buildings on the South Raymond Street property. The buildings thereafter constructed became the property of Terrafen. The books of Terrafen show that as of December 31, 1958, Terrafen owed $88,120.09 to Fender. As of April 8, 1959, the amount owed had increased to $108,120.09. Between April 8, 1959, and September 22, 1961, Terrafen's debt to Fender was reduced from $108,120.09 to $7,818.63 by the payment to Fender of $100,301.46 during said period. None of the funds received by Fender from Terrafen were used to pay or reduce his indebtedness to Instrument. No collateral has been provided or interest paid by Fender at any time on the outstanding balance in account (number 6A). Fender could not recall *246 whether there ever existed a plan for the repayment of amounts withdrawn from Instrument and until just prior to the trial in this proceeding, he had no recollection as to the amount of his alleged indebtedness to Instrument. In fact, Fender admitted that he had never given the matter any thought. From its inception through the end of the year 1958, Instrument's earned surplus, shown by its books of account, has accumulated the following yearly balances: Year
Credit Balance
1951
$ 520.08
1952
36,251.93
1953
56,342.26
1954
57,460.61
1955
82,919.52
1956
102,675.86
1957
140,900.20
1958
159,608.44
With the exception of a nontaxable stock dividend of $26,685.52 declared and distributed in 1954, Instrument has not declared or paid any formal dividends with respect to its stock from its inception to the present date. Sales was organized and incorporated under the laws of the State of California on February 5, 1953, to engage in the business of acting as exclusive sales agent for Instrument. Sales was authorized to issue 2,500 shares of common stock having a par value of $100 per share. On June 1, 1953, Sales issued 200 shares of its common stock as follows: *247 Number of
Corporate
Name
Shares
Office (Sales)
Donald D. Randall
50
President
Charles R. Hayes
50
Vice-President
Francis C. Hall
50
Secretary
C. Leo Fender
50
Treasurer
The above four individuals also constituted the original board of directors of Sales. Sales agreed to pay each of its officers as compensation for their services to the corporation the amount of $15,000 per year. Sales also agreed to pay both Randall and Hayes and additional yearly compensation of 3 percent of the corporation's annual sales. During each of the fiscal years ended May 31, 1954, and May 31, 1955, Sales accrued on its books of account and deducted on its income tax returns the amount of $60,000, which represented officers' salaries of $15,000 payable to Randall, Hayes, Hall and Fender. On November 7, 1955, shortly after the death of Hayes, Sales entered into a stock purchase agreement with Hall and the estate of Hayes whereby Sales was to acquire the stock of both Hayes and Hall in return for which it was to give each of them its promissory note for $45,000. The notes were fully discharged by December 6, 1956. The acquired stock has been treated as treasury stock *248 by Sales. After November 7, 1955, Fender and Randall were the sole shareholders of Sales, each of said individuals owning 50 shares of stock. On November 15, 1955, Esther Fender and Jean E. Randall were elected to succeed Hayes and Hall as members of the board of directors of Sales. On November 15, 1955, Esther and Jean were elected vice-presidents of Sales, and Fender, who was treasurer of Sales, also was elected secretary of the corporation. Randall continued to hold the position of president of Sales. On November 22, 1955, Sales agreed to pay Randall and Fender amounts equal to 4 percent and 1 percent, respectively, of the corporation's annual sales as compensation for their services to the corporation. In addition, Randall and Fender were to continue to receive the amount of $15,000 per year for services rendered. No compensation was paid by Sales to Esther or to Jean. Sales from its inception has been plagued by a short cash position. This financial predicament has been caused primarily by the fact that Sales must pay for its purchases upon receipt from Instrument and by the fact that it was often required to finance the dealers who purchased its merchandise. In 1955 *249 Sales found it necessary to seek bank financing. Originally the bank loanedmoney to Sales on a completely unsecured basis. Later the bank requested various types of security for its loans such as the subordination of other liabilities and personal guarantees from the corporate officers. The bank in addition became concerned about the accrued officers' salary liabilities that appeared on Sales' balance sheet. The bank's concern was attributable to the fact that said liabilities could conceivably represent potential priority claims over the bank's claim. The bank suggested that the aforesaid liabilities be capitalized. During the fiscal year ended May 31, 1956, Sales accrued on its books of account the amount of $30,000, which amount represented officers' salaries payable in the amounts of $15,000 each to Randall and Fender. Sales deducted said amount of $30,000 on its Federal income tax return for the fiscal year ended May 31, 1956. As of August 6, 1956, Sales was indebted to Randall and to Fender in the amounts of $45,000 each, representing officers' salaries payable for the fiscal years ended May 31, 1954, 1955 and 1956. On or about August 6, 1956, Randall and Fender, in order *250 to comply with the bank's request, offered to discharge Sales' liability for salaries due and payable to them by accepting from Sales an additional share of $100 par value common stock for each $100 of salary debt. On August 6, 1956, the board of directors of Sales resolved to accept the offers by Randall and Fender. After obtaining a permit from the Commissioner of Corporations of the State of California, Sales on December 3, 1956, issued to Randall and to Fender 450 shares each of its $100 par value common stock in discharge and cancellation of its indebtedness of $45,000 owing to each of said individuals. Immediately prior to said issuance, Randall and Fender owned 50 shares each of Sales stock, said 100 shares being the total of all stock issued and outstanding. Immediately subsequent to said issuance, Randall and Fender owned 500 shares each of Sales stock, said 1,000 shares being the total of all stock issued and outstanding. As a result of said issuance, Sales' capital stock account was increased from the amount of $10,000 to $100,000 and its $90,000 liability for salaries owed to Randall and Fender was discharged and cancelled. During the fiscal year ended May 31, 1957, Sales *251 accrued on its books of account the amount of $30,000, which amount represented officers' salaries payable in the amounts of $15,000 each to Randall and Fender. Sales deducted said amount of $30,000 on its Federal income tax return for the fiscal year ended May 31, 1957. As of February 3, 1958, Sales was indebted to Randall and Fender in the amounts of $15,000 each, representing officers' salaries for the fiscal year ended May 31, 1957. On or about February 3, 1958, Randall and Fender offered to discharge Sales' liability for salaries due and payable to them by accepting from Sales an additional share of $100 par value common stock for each $100 of salary debt. On February 3, 1958, the board of directors of Sales resolved to accept the offers by Randall and Fender. On May 9, 1958, Sales, after receiving its permit to issue additional stock from the Commissioner of Corporations, issued to Randall and Fender 150 shares each of its $100 par value common stock in discharge and cancellation of its indebtedness of $15,000 owing to each of said individuals. On the same date, Sales issued to Randall and Fender 350 shares each of its $100 par value common stock as a stock dividend. Immediately *252 prior to said issuances, Randall and Fender each owned 500 shares of Sales stock, said 1,000 shares being the total of all stock issued and outstanding. Immediately subsequent to said issuances, Randall and Fender each owned 1,000 shares of Sales stock, said 2,000 shares being the total of all stock issued and outstanding. As a result of said issuances, Sales' capital stock account was increased from $100,000 to $200,000, its earned surplus account was decreased $70,000, and its $30,000 liability for salaries owed to Randall and Fender was discharged and cancelled. At all times since its incorporation Sales has been a financially solvent corporation. On their individual Federal income tax returns for the years 1956 and 1958, Fender and his wife did not report any amount as taxable income resulting from Fender's receipt of 450 shares of Sales stock on December 3, 1956, and 150 shares of Sales stock on May 9, 1958. On their individual Federal income tax returns for the year 1956 and on their joint Federal income tax return for the year 1958, Randall and his wife did not report any amount as taxable income resulting from Randall's receipt of 450 shares of Sales stock on December 3, 1956, and *253 150 shares of Sales stock on May 9, 1958. On its corporate Federal income tax returns for the fiscal years ended May 31, 1957, and May 31, 1958, Sales did not report any amount as taxable income resulting from the discharge and cancellation on December 3, 1956, and May 9, 1958, of its indebtedness for officers' salaries payable to Fender and Randall. For the past 15 years Randall has been interested in flying. He possesses a single-engine, multi-engine, instrument and commercial pilot's license. In 1951 or 1952 Randall purchased his first airplane, a Cessna 140. The Cessna was later traded for a Stinson, and the Stinson was sometime later traded for a 1947 Beechcraft Bonanza. On June 1, 1953, Randall sold his Beechcraft to Sales and accepted in payment therefor a promissory note in the amount of $7,500. In April 1956, Sales returned to Randall the 1947 Beechcraft Bonanza, Model G 35, airplane which Randall agreed to accept in full payment of the promissory note in the amount of $7,500 given to him in June 1953. No prior payments had been made on said promissory note. In April 1956, Randall purchased a new Beechcraft Bonanza, Model G 35, airplane using the 1947 model aircraft *254 as a trade-in thereon. Upon purchasing the new airplane, Randall leased said aircraft to Sales. The terms of said lease required Sales to pay to Randall $1,000 per month rent and also to pay for all operational and maintenance expenses incident to the operation of the airplane. In January 1957 Randall purchased a new Piper Apache, Model PA 23, airplane using the 1956 Beechcraft Bonanza, Model G 35, airplane as a trade-in thereon. Upon purchasing said Piper Apache airplane, Randall leased said aircraft to Sales. The terms of said lease required Sales to pay Randall $1,000 per month rent and also to pay for all operational and maintenance expenses incident to the operation of the airplane. In May 1958, Randall purchased a new Piper Apache, Model PA 23, airplane using the 1957 Piper Apache, Model PA 23, airplane as a trade-in thereon. Upon purchasing said Piper Apache airplane, Randall leased said aircraft to Sales. The terms of said lease required Sales to pay to Randall $1,000 per month rent and also to pay for all operational and maintenance expenses incident to the operation of the airplane. In October 1958, Randall purchased a Piper Cub airplane exclusively for his personal *255 use. Randall was the only employee of Sales authorized to fly the aircraft leased to said company. He was not, however, paid special compensation for the performance of flying duties. During the years involved herein the aircraft leased to Sales were used in making trips to see dealers, to attend trade showings and to conduct sales meetings with Sales' 12 salesmen stationed throughout the country. The aircraft were also used by Randall on occasions when his purpose in flying was not to travel but merely to maintain his flying proficiency. Randall's son accompanied his father on many of such flights. His son soloed as a pilot on September 12, 1958, at the age of 16. On occasion during the years involved herein, members of Randall's family, i.e., his wife or son, would accompany him while he was flying Sales' aircraft. Among the locations the Randalls visited by plane was Las Vegas, Nevada. On at least one occasion, Randall flew the Sales' airplane to Gold Beach, Oregon. While there Randall stayed in a cabin called the Anglers and engaged in fishing. While there he telephoned one dealer and saw another in person. The Federal Aviation Agency requires pilots to maintain an aircraft *256 and engine log. Although Randall kept no formal operations log showing the various flights made with Sales' aircraft, he stated that he did keep a file of flight plans, gas receipts and other items that represented flight time. These records were not submitted into evidence, however. Opinion Issues 1 and 3 In North American Oil v. Burnet, 286 U.S. 417 (1932) the Supreme Court held that a taxpayer is taxable in each year on all of the income received in that year under a claim of right and without restriction as to its use. Relying on this principle, the respondent contends that since Fender received the Instrument bonus checks in 1956 and 1957 under "an incontrovertible claim of right and had absolute control over the disposition of the amounts," he is taxable on the entire amount of the bonus, and this is so notwithstanding the fact that Fender returned a portion of each bonus to Instrument. Petitioners advance the argument that where in the year of receipt the recipient renounces his right to income and repays the rightful owner, the claim of right doctrine is not applicable and the recipient is not taxed upon the amounts returned. This Court has adopted and *257 consistently followed the legal proposition that where prior to the close of the taxable year there has been an adjustment of the contract or obligation and a repayment of a portion of the amount received, the tax liability is to be determined on the basis of such adjusted amount. H. C. Couch, 1 B.T.A. 103 (1924); H. B. Hill, 3 B.T.A. 761 (1926); Guy Fulton, 11 B.T.A. 641 (1928); Albert W. Russel, 35 B.T.A. 602 (1937); Willis W. Clark, 11 T.C. 672 (1948); Curran Realty Co., 15 T.C. 341 (1950). Other courts have adhered to a similar position. See Skinner Mfg. Co. v. United States, 8 F. Supp. 741 (Ct. Cls. 1934); Stern-Slegman-Prins Co. v. Commissioner, 79 F. 2d 289 (C.A. 8, 1935) affirming a Memorandum Opinion of this Court; United States v. Merrill, 211 F. 2d 297 (C.A. 9, 1954); Penn v. Robertson, 115 F. 2d 167 (C.A. 4, 1940). Respondent submits that the aforenoted cases are distinguishable from the instant case in that in the cited cases the adjustments to income were made not only within the recipient's taxable year of receipt but also within the payor's *258 taxable year of deduction. Respondent's position is not well taken. Willis W. Clark, supra, contains circumstances nearly identical to the instant case. In that case the taxpayer was the president, director and substantial shar-holder in a closely-held electrical construction company. The taxpayer had an employment contract which provided for the payment to him of a salary of $24,000 a year, plus a bonus of 20 percent of the net profits. The contract was for an indefinite term. During 1941 the company paid the taxpayer his base salary of $24,000, plus a bonus of $60,000 which was based on estimated profits for the year. In March 1942 the company paid the taxpayer an additional $34,208.14 based on 1941 profits as actually determined. In its returns for 1941, which were made on an accrual basis and for a calendar year, the company claimed a deduction of $118,204.14 ($24,000 plus $94,204.14). A revenue agent made an examination of the company's 1941 returns a few months after they were filed and recommended the disallowance of a portion of the compensation paid to taxpayer as well as to another employee of the company. The taxpayer discussed the matter with the other directors *259 and at his suggestion it was agreed that he would refund to the company any compensation for 1941 in excess of that finally allowed by Internal Revenue Service as a deduction. The Internal Revenue Service and the company finally agreed that a compensation to taxpayer of $90,000 for 1941 was reasonable. Pursuant to his understanding with the directors, the taxpayer gave the company his promissory note for $28,208.14, representing the disallowed portion of 1941 compensation. This Court held that under such circumstances the agreement was a modification of his 1939 employment contract and that as a result the taxpayer was taxable in 1942 on only $6,000 of the $34,208.14 of the 1941 bonus paid to him in 1942. In the instant case, Fender was aware of the precarious cash position of Instrument, the existence of which is stipulated by the respondent, and on or about the time he was to receive his bonus payment in each of the years 1956 and 1957, he offered to return his bonus to the company. The offer was accepted in each instance. Thereafter, in virtually integrated payment-refund transactions, Fender received Instrument's checks and either returned the check, the case in 1956, or issued *260 his personal check to cover the refund in the case of 1957. Under these circumstances Willis W. Clark, supra, provides a definite and basically indistinguishable precedent. Respondent argues however that Fender never intended to reduce his compensation and that the return of the bonuses represented in the disjunctive a gift to Instrument, a partial repayment of Fender's indebtedness to Instrument, a loan to Instrument or a contribution to Instrument's capital. Taxation is eminently practical, Tyler v. United States, 281 U.S. 497 (1930), and from a practical as well as a reasonable standpoint, we do not think such a construction of the acts of the parties is justified. In our opinion, what occurred was tantamount to nothing more than a relinquishment by Fender in the year of receipt of a part of what he was entitled to receive under his contract, and the acceptance of such a relinquishment by Instrument. The offer to relinquish and its acceptance constituted a modification of Fender's contract to the extent intended by the parties. In H. C. Couch, supra, at p. 105, we noted under somewhat similar conditions that: Salary arrangement between *261 corporations and their principal shareholders and managers in cases like this one, where the manager is expected by his associates to protect the interests and the future prospects of the company even at sacrifice to himself, are and must be at times subject to such modification as may be made by agreement from time to time; * * * The fact that the bookkeeper of Instrument may have recorded the transaction initially as a loan or repayment of indebtedness is not controlling for tax purposes. Arcadia Amusement Co., 14 B.T.A. 1335, 1337 (1929); Eakins v. United States, 36 F. 2d 961 (D.C.N.Y., 1930); Helvering v. Midland Ins. Co., 300 U.S. 216 (1937). In view of what we have previously stated herein, we think the respondent erred in including the portions of the 1955 and 1956 bonuses which were returned by Fender to Instrument in the year in which he received them in Fender's taxable income. We correlatively conclude that for the year 1956 Instrument did not understate its deductions to the extent of $22,000 and that for the year 1957 Instrument did not overstate its taxable income to the extent of $25,000. Issue 2 The respondent determined *262 that the $40,000 withdrawn from Instrument by Fender in 1958 did not constitute a bona fide indebtedness but rather constituted a disguised distribution of a dividend. The question whether a particular withdrawal from a corporation represents a loan or a taxable dividend is one of fact. Irving T. Bush, 45 B.T.A. 609 (1941), remanded an other grounds 133 F. 2d 1005 (C.A. 2, 1943); Victor Shaken, 21 T.C. 785 (1954). In section 316 of the Internal Revenue Code of 1954[8] a dividend is defined, in effect, as any distribution of property made by a corporation to its shareholders out of current or accumulated earnings and profits. Hence, Fender's withdrawal of $40,000 is to be deemed a dividend unless he can affirmatively establish that it was intended to be a loan. W. T. Wilson, 10 T.C. 251, 256 (1948), affirmed sub nom. Wilson Bros. & Co. v. Commissioner, 170 F. 2d 423 (C.A. 9, 1948), certiorari denied 336 U.S. 909 (1949); Carl L. White, 17 T.C. 1562, 1568 (1952). The courts have generally recognized that while no single factor is determinative of the character of the withdrawal *263 ( Ben R. Meyer, 45 B.T.A. 228 (1942); Elliott J. Roschuni, 29 T.C. 1193, 1201 (1958), affd. per curiam 271 F. 2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960); William C. Baird, 25 T.C. 387, 393 (1955)), when the withdrawers are in substantial control of the corporation, such control invites a special scrutiny of the situation.
In the instant case, we are of the opinion that the withdrawal of $40,000 by Fender constituted a distribution taxable as a dividend. The record discloses that Fender has absolute control and dominion over Instrument; that Instrument had large accumulated earnings and profits; that Instrument since its incorporation had never declared a taxable dividend; that Fender had not provided any collateral for the note; that no interest was ever accrued by Instrument; and that Fender, the maker, was the only one who knew of the promissory note's existence until 1960. In ascertaining Fender's intention with respect to the $40,000 withdrawal, we think it is also proper to consider the circumstances *264 that surround the other withdrawals from Instrument which appear in account (number 6A). In this connection the record discloses that no notes were ever given, no interest was ever paid, nor was any security ever posted by Fender to secure these withdrawals. Furthermore, Fender indicated that he had no knowledge as to how much money he actually owed the corporation, and that he had never given the matter any thought. He admitted that he had no specific plan for repayment of the advances and that although he had received in excess of $100,000 from Terrafen in repayment of its indebtedness to him, he had not applied any of this money to repay his withdrawals from Instrument. The circumstances surrounding the $40,000 withdrawals in corroboration with the circumstances under which previous withdrawals were obtained adequately support respondent's determination that the $40,000 withdrawal was intended to be a loan but was intended to be for the permanent use of Fender. Fender in arguing that the $40,000 withdrawal constituted a bona fide loan points out as factors favoring his contention that the amount withdrawn was carried on the books of Instrument as a receivable, that a five-year *265 promissory note providing for the payment of interest was executed, and from time to time repayments were made of the amounts withdrawn. The fact that the corporation reflected the withdrawals in the form of a receivable is not a controlling factor and particularly so when the withdrawer is in control of the corporation. Elliott J. Roschuni, supra; C. W. Murchison, 32 B.T.A. 32 (1935); A. W. Mellon, 36 B.T.A. 977, 1061 (1937). This same reasoning applies to the execution of a promissory note since the execution and collection of the $40,000 note were for all practical purposes under the exclusive dominion of Fender. Ben R. Meyer, supra. See also William C. Baird, supra.In addition, it is noteworthy that prior to 1960 the note's existence, if it did in fact exist prior to that time, was known only by Fender. In connection with Fender's contention relating to the effect of various repayments on the bona fides of the withdrawals, it should be noted that such repayments were in fact credits to the account occasioned for the most part by Fender's relinquishment of his rights to certain salary, bonus, or rental payments. Fender's *266 relinquishment of such rights was admittedly caused by Instrument's precarious cash position and its inability to make such payments. In view of the foregoing, we do not believe Fender has sustained his burden of showing that the withdrawal of $40,000 in 1958 was intended as a bona fide loan. Accordingly, the respondent's determination with respect to this issue is sustained. Issue 4 The respondent contends that the receipt of additional stock in Sales in payment of accrued salaries constituted taxable income to Fender and Randall. Petitioners Fender and Randall relying on Eisner v. Macomber, 252 U.S. 189 (1920), take the position that since the issuance to them of additional shares of common stock did not effect any change in their proportionate ownership in the corporation, the receipt of the stock did not give rise to income. We agree with the petitioners. Fender and Randall were the sole shareholders of Sales regardless of whether they each owned 50 shares or 1,000 shares. Their wealth was no more increased by the issuance of additional shares than if the corporation had caused its stock to be split 20 for 1. The issuance of such additional shares to Fender *267 and Randall did not constitute income to them within the meaning of the 16th amendment to the Constitution regardless of whether it represented a stock dividend or represented compensation for services. Eisner v. Macomber, supra.See also Deloss E. Daggitt, 23 T.C. 31 (1954). Our holding in this respect makes it unnecessary to consider the effect of section 305 [9] on the stock distribution. Issue 5 Respondent contends that if the distributions of common stock to Fender and Randall are held to be nontaxable, then Sales realized taxable income upon the cancellation of salary indebtedness owed to Fender and Randall. Since the Supreme Court's decision in Helvering v. Amer. Dental Co., 318 U.S. 322 (1943), this Court has held that the voluntary or gratuitous forgiveness of a corporate indebtedness by a shareholder of that corporation *268 did not produce taxable income to the corporation. George Hall Corporation, 2 T.C. 146 (1943); McConway & Torley Corporation, 2 T.C. 593 (1943). In Lidgerwood Manufacturing Co., 22 T.C. 1152 (1954), affd. 229 F. 2d 241 (C.A. 2, 1956), certiorari denied 251 U.S. 951 (1956), we held that the voluntary cancellation of the corporation's indebtedness by a shareholder constituted a capital contribution. Other courts have similarly held that the cancellation of a debt owed by a corporate debtor to a stockholder of the debtor does not constitute taxable income to the debtor but is a capital contribution by the creditor. Lidgerwood Mfg. Co. v. Commissioner, 229 F. 2d 241 (C.A. 2, 1956); Pennsylvania Electric Company v. United States, 135 F. Supp. 416 (Ct. Cls., 1955); Bratton v. Commissioner, 217 F. 2d 486 (C.A. 6, 1954), remanding on other grounds a Memorandum Opinion of this Court. See also Income Tax Regs. 1.61-12(a). After considering the record in this proceeding in conjunction with the rationale of the aforenoted cases, we have come to the conclusion that *269 the cancellation of Sales' salary indebtedness by Fender and Randall constituted in fact and effect a contribution to capital. Respondent contends that the cancellation of indebtedness was not voluntary of gratuitous since Fender and Randall in cancelling the indebtedness were reacting to the bank's demands that such indebtedness be eliminated. The absence of a business purpose is not a sine qua non of a capital contribution. In accord, Pennsylvania Electric Co. v. United States, supra, where the Court of Claims stated that "* * * a contribution to capital of a corporation does not require a donative intent, in the sense that there should be no business motive in making it, as it is always the proprietor's business motive of making his property more valuable." Since section 118 provides that "in the case of a corporation, gross income does not include any contribution to the capital of the taxpayer," we hold that Sales did not receive taxable income by reason of the cancellation of its salary indebtedness to Fender and Randall. Issue 6 This issue concerns whether the total amounts paid by Sales to Randall for the use of Randall's airplane during the years 1956 *270 and 1957 represent a proper rental expense. The respondent disallowed 12 1/2 percent of the deduction claimed on the ground that said aircraft during the period of its lease in 1956 and 1957 was used by Randall in furtherance of his personal pursuits and enjoyment. The issue is one of fact, and the respondent's determination is prima facie correct. Although Randall stated that he never used the plane for nonbusiness purposes, he did admit on cross-examination that he made occasional flights solely for the purpose of maintaining his flying efficiency and that his son frequently accompanied him on such flights. He also admitted that he made several flights accompanied by his wife to Las Vegas and that on one occasion he flew to Oregon "on business" and did some fishing while there. Because of the opportunity for abuse, the courts have always looked with careful scrutiny at transactions between a corporation and these in control of it. Challenge Manufacturing Co., 37 T.C. 650, 660 (1962); Limericks, Inc., 7 T.C. 1129 (1946), affd. 165 F. 2d 483 (C.A. 5, 1948); Stanwicks, Inc., 15 T.C. 556 (1950), affd. per curiam 190 F. 2d 84 *271 (C.A. 4, 1951). Considering Randall's avid interest in flying as well as his numerous trips to vacation and tourist spas accompanied by members of his family, we find it difficult to believe that no more than an inconsequential part of his flying encompassed personal pursuits. See and compare Rodgers Dairy Co., 14 T.C. 66, 73 (1950). Under such circumstances and in the absence of documentary evidence to corroborate the ipse dixit of Randall, we hold that petitioner Sales has not sustained its burden of proving error in respondent's determination. Accordingly, the respondent's disallowance of a portion of the claimed rental deduction for the fiscal years ended May 31, 1956 and 1957 is sustained. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Donald D. Randall and Jean E. Randall, Docket No. 92758; Esther Fender, Docket No. 92759; Jean E. Randall, Docket No. 92760; Donald D. Randall, Docket No. 92761; C. Leo Fender, Docket No. 92762; and Fender Electric Instrument Co., Inc., Docket No. 947-62.↩
*. By official order of the Tax Court, dated May 8, 1963 and signed by Judge Fay↩, the court's opinion, filed April 26, 1963, was amended by striking the figures 53,904.85 and 10,220.86 and inserting therefor 7,104.85 and 57,020.86 respectively.
2. Although the respondent made other adjustments to various income and expense items in each of the seven dockets, the petitioners have assigned no error with respect to many of these items. Consequently, the Court has assumed that such items have been conceded by the respective petitioners.↩
3. Receivable account (number 6) was a clearing account and reflected nonbusiness transactions between Fender and Instrument. ↩
4. The credit of $24,058.37 instead of $24,809.43 was the result of a bookkeeper's error.↩
5. Although Fender actually returned $24,809.43 of his 1955 bonus, the public accountant in making the correcting entries to Instrument's books used the figure contained in the minutes of January 12, 1956, i.e., $22,000.↩
6. Although Fender's basic salary was $1,000 per month, he did not receive his last monthly salary payment for 1957 until 1958.↩
7. In November 1955 the amount of $2,474.42 was erroneously posted as a debit to account (number 6A). Consequently, this amount has been eliminated and the balances set forth in the above schedule reflect this correction.↩
8. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954.↩
9. SEC. 305. DISTRIBUTIONS OF STOCK AND STOCK RIGHTS. (a) General Rule. - Except as provided in subsection (b), gross income does not include the amount of any distribution made by a corporation to its shareholders, with respect to the stock of such corporation, in its stock or in rights to acquire its stock.↩